## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MAINE

In re:

Michael James DeLeo,

      Debtor

Chapter 11
Case No. 21-20025

## MEMORANDUM OF DECISION

The debtor in this chapter 11 case, Michael DeLeo, believes that his plan can be confirmed despite rejection of the plan by two classes of impaired claims.    The debtor believes that his plan can be crammed down on the holders of these claims because, in his view, the plan does not unfairly discriminate against them and is fair and equitable to them.    The Court is not persuaded.    As a result, confirmation will be denied.

Since this case began, the debtor has filed multiple plans including a Plan of Reorganization Dated November 29, 2021 [Dkt. No. 153] (the "Plan").    Following approval of a related disclosure statement, the debtor solicited votes on the Plan.    Two classes of claims rejected the Plan, and there are two objections to confirmation, one from the United States trustee and one from Anthony Vegnani.    As discussed below, these objections highlight fatal flaws in the Plan.

There are seven creditors in this case.    Two of them hold liens on the debtor's principal residence and those creditors have not been active in the case and do not factor into the confirmation dispute.    The third creditor, the Internal Revenue Service, initially objected to confirmation but has since reached agreement with the debtor (on terms that have not yet been reduced to writing and placed on the docket).    A former employer of the debtor is the fourth

1

creditor, and the debtor's former counsel is the fifth.    The sixth creditor, Navient Solutions, LLC, asserts a significant claim based on student loans.

Anthony Vegnani is the seventh creditor, and the debtor views him as the principal antagonist in this case.    The debtor acknowledges that this case was filed to thwart Mr. Vegnani's effort to collect on a state court judgment entered against the debtor.    Although that judgment is final in the sense that there is no pending appeal nor can there be a further one at this point, the debtor believes that, ultimately, he should not be liable to Mr. Vegnani for any amount. The debtor has brought a lawsuit against his former counsel, asserting that the Vegnani judgment was a product of counsel's malpractice and that, but for the malpractice, the debtor would not have been found liable to Mr. Vegnani for breaches of an employment agreement.    That lawsuit, in the form of an adversary proceeding, is pending in the United States District Court for the District of Maine and is termed the "Jones Adversary Proceeding" in the Plan.[1]

In general, the debtor has two potentially significant assets: a one-half undivided interest in his principal residence and the Jones Adversary Proceeding.    The principal residence is jointly-owned with his spouse, and the debtor estimates that the residence is valued at $1,750,000.    The debts secured by liens on the residence total approximately $565,000.    Even accounting for the debtor's claimed exemption and the possibility of a liquidation discount, there is significant equity in the residence.    The Jones Adversary Proceeding is harder to value, although the debtor asserts that his damages include the "face value" of Mr. Vegnani's claim plus the legal fees incurred by the debtor in the chapter 11 case.    Specifically, the debtor estimates that the Jones Adversary Proceeding has a value of approximately $650,000.

---

[1]    Capitalized terms used but not defined in this Memorandum of Decision have the meanings assigned to such terms in the Plan.

The Plan designates eight classes of claims, as follows:

| Class | Type of Claims | Holder(s) | Impaired Status according to the Plan |
|-------|----------------|-----------|----------------------------------------|
|   |   |   |   |
| 1 | Allowed Secured Claims | Saco & Biddeford Savings Institution | No |
| 2 | Allowed Secured Claims | Bangor Savings Bank | No |
| 3 | Allowed Secured, Priority, or Unsecured Claims | Internal Revenue Service | No |
| 4 | All Allowed Claims | Medlogix, LLC | Yes |
| 5 | [Intentionally Blank] |   |   |
| 6 | All Allowed Claims | Navient Solutions, LLC | No |
| 7 | All Allowed Claims | Miranda S. Jones, Esq., and O'Reilly, Grosso, Gross & Jones, P.C. | Yes |
| 8 | Allowed Unsecured Claims | Including, but not limited to, Anthony Vegnani | Yes |

As is obvious from this table, the Plan makes more of an effort to classify creditors than it does to classify claims.

While much of parties' focus has been on treatment of the various classes of claims, other features of the Plan deserve early mention.   First, the Plan provides that, following confirmation, the debtor would "retain" all of his Assets while also having the freedom to sell, transfer, assign, settle, or otherwise dispose of those Assets as he sees fit, with no notice to, input from, or approval by the Court or any creditors.   While the Plan does suggest some limitation on the debtor's ability to use the Assets, that limitation is far from clear and, as drafted, would not provide much, if any, assurance that existing or future asset value will be preserved and made available for creditors.   In essence, the Plan would largely give the debtor a free hand to deal with the Assets, including the residence.

Second and similarly, the Plan gives the debtor unfettered discretion to settle the Jones Adversary Proceeding "on the terms he deems appropriate without need for notice to or approval

by the Bankruptcy Court."   Plan § 4.8.A.   The Plan provides this wide latitude even though a portion of any recovery from the Jones Adversary Proceeding is offered as security for the debtor's payment obligations with respect to a note to be issued under Class Eight.

The United States trustee objects that the Plan's separate classification and different treatment of Navient's claim discriminates unfairly against Mr. Vegnani's claim.   In the United States trustee's estimation, this discrimination exists because Navient is offered "a clear (and arguably) guaranteed stream of payments under the Plan," while Mr. Vegnani is offered something far less certain.   The United States trustee also asserts that the Plan is not feasible.

For his part, Mr. Vegnani raises three objections to confirmation.   First, he contends that the Plan is not feasible.   Second, he surmises that he would be better off in a chapter 7 liquidation.   Finally, Mr. Vegnani cites <u>Granada Wines, Inc. v. New England Teamsters &</u> <u>Trucking Industry Pension Fund</u>, 748 F.2d 42 (1st Cir. 1984), and posits that "[i]n designating classes in his Plan, the Debtor has engaged in gerrymandering."

As explained below, the undisputed material facts yield a singular conclusion: the debtor cannot meet his burden of showing that the Plan is fair and equitable to, and does not unfairly discriminate against, Class Eight.   The Plan cannot be confirmed as a matter of law.

## I.   **Fatal Flaws**

A chapter 11 plan must designate classes of claims and interests.   *See* 11 U.S.C. § 1123(a)(1).   Classification is governed by 11 U.S.C. § 1122, and a chapter 11 plan that does not comply with section 1122 cannot be confirmed.   *See* 11 U.S.C. § 1129(a)(1).   Putting aside a convenience class, a class must only contain claims that are substantially similar to each other. *See* 11 U.S.C. § 1122(a).   As a general rule, a chapter 11 plan must provide for equal treatment of all claims in a class.   *See* 11 U.S.C. § 1123(a)(4).   Taken together, these statutes—and other

parts of the Bankruptcy Code—reflect a foundational principle of bankruptcy: similarly-situated creditors must be treated equally.   Because classification of claims affects critical aspects of chapter 11 practice—most notably, voting and payment of claims—proper classification of claims is vitally important.

The First Circuit has not directly addressed the requirements of section 1122. Granada Wines discussed certain classification arguments, but it was not a section 1122 case or even a separate classification case.   *See* Granada Wines, 748 F.3d at 46-47 ("First, Granada's reorganization plan did not place the Pension Fund claim in a separate class; it was listed with other general unsecured claims in Class 7 of Granada's Amended Disclosure Statement.").[2] The court's pronounced "general rule" indicating that all substantially similar claims "should be placed in the same class," *see* Granada Wines, 748 F.2d at 46 (internal quotation marks omitted), is dicta and has been recognized as such by some courts.   *See, e.g.*, In re Northeast Dairy Co-op Fed'n, Inc., 73 B.R. 239, 249 (Bankr. N.D.N.Y. 1987).

But even if this Court were to view Granada Wines as controlling on the question of classification, the case does not appear to establish an immutable rule.   In other words, Granada Wines acknowledges that divergence from the general rule of classification is not strictly prohibited and may be justified depending upon the circumstances of the case.   *E.g.*, Granada

---

[2]   Instead, Granada Wines involved a debtor's effort to pay one creditor—a pension fund—a different percentage recovery than the other creditors in its same class.   The debtor wanted to pay 30% to other creditors holding general unsecured claims, but only wanted to pay 15% to the pension fund. The debtor's payment proposal was based on a belief that pension-related federal law reduced the pension fund's claim by 50%.   The debtor wanted to pay 15% of the full amount of the pension fund's claim (which would have been equivalent to 30% of the claim reduced by half).   In other words, the debtor's original theory of the case turned on the allowed amount of the pension fund's claim.   Among other arguments on appeal, the debtor attempted to justify its disparate treatment of the pension fund's claim by arguing that the claim *could have been* separately classified, prompting the court to theorize about whether that might have been permissible.

Wines, Inc., 748 F.2d at 46-47 (discussing potential exception to general rule as applied to unsecured creditors); *see also, e.g.*, Barakat v. The Life Ins. Co. of Va. (In re Barakat), 99 F.3d 1520, 1524-26 (9th Cir. 1996) (describing disagreement among courts as to proper extent of limitations on separate classification and expressing agreement with those that require sound business or economic justification to support separate classification of substantially similar claims).

Instead of addressing the classification-related Plan objections under section 1122 or section 1129(a)(1), the Court will treat them as if they raise concerns under section 1129(b) about unfair discrimination against and unfair and inequitable treatment of Class Eight, an impaired class that rejected the Plan.[3]   There are three reasons for treating the objections this way.   First, the objecting parties do not explicitly invoke section 1122 or section 1129(a)(1) in their written objections.   Second, because the Plan has been rejected by an impaired class of claims, confirmation can be achieved, if at all, only by resort to section 1129(b).   Third, in a chapter 11 case, the concept of "unfair discrimination," as invoked in the United States trustee's objection, is one that arises only when confirmation is being pursued under section 1129(b). *See* 11 U.S.C. § 1129(b)(1) (requiring that plan "not discriminate unfairly, and [be] fair and equitable, with respect to each [rejecting impaired] class").[4]

---

[3]   Class Seven is also an impaired class that rejected the Plan.   At a recent hearing, the debtor withdrew an objection to the only claim in Class Seven and represented that, by agreement-in-principle with the creditor, the claim will be reclassified in any modified plan.   Thus, concerns about unfair discrimination against or unfair and inequitable treatment of Class Seven are not addressed here.

[4]   By contrast, in a chapter 13 case, the concept of "unfair discrimination" is one relating to classification of claims, which is not a mandatory step under chapter 13.   *See* 11 U.S.C. § 1322(b)(1).

### a. **Unfair Discrimination Against Class Eight**

Navient's claim, stemming from federal student loan debt, is a general unsecured claim for approximately $600,000.[5]    This type of debt generally cannot be discharged under chapter 11, *see* 11 U.S.C. §§ 523(a)(8), 1141(d)(2), and the debtor is not seeking to discharge it.    The debtor has placed Navient's claim alone in Class Six, which the Plan identifies as unimpaired. No specific rights or obligations, including those related to the payment schedule or amounts, are stated in the Plan.    However, the debtor has represented that the contractual payment on this debt is around $3,300 per month and that it would take at least 15 years to pay the debt in full.

Like Navient, Mr. Vegnani also holds an unsecured claim that is not entitled to priority under section 507.    His claim is for about $810,000 and, as noted above, it stems from a state court judgment against the debtor.    There has been no suggestion that Mr. Vegnani's claim is excepted from discharge.    Although substantially similar to Navient's claim, Mr. Vegnani's claim is not placed in Class Six; instead, the claim is placed in Class Eight.[6]

As to the treatment of Class Eight, the debtor proposes to issue a promissory note to each claimholder "in the face amount of [the claimholder's] Allowed Claim."    Plan § 4.8.A.    The debtor also proposes that interest would accrue on each note at a rate to be determined by the Court during the confirmation process based upon a method that the debtor suggests is typical but requiring expert testimony.    No specific interest rate is suggested, but the debtor indicates

---

[5]    The debtor's counsel has represented that this debt was incurred to refinance debts for the post-secondary education of the debtor's children, who, apparently, are not obligated on the debt or any portion of it.

[6]    Ignoring what appears to be a minor drafting glitch, the Plan appears to contemplate that Mr. Vegnani is the only holder of a claim in Class Eight.    Indeed, he cast the only ballot in Class Eight. After voting concluded, the debtor indicated, on the record during a hearing, that he would modify the Plan to include another claim in Class Eight.    Even so, Mr. Vegnani's claim would still represent more than 98% of the allowed claims, by dollar amount, in Class Eight.

that the national prime rate could serve as the base.    The debtor also proposes to make quarterly payments on each note in equal installments for seven years based on a 30-year amortization schedule.    At the conclusion of the seven-year term, the debtor proposes to pay the remaining balance in a balloon payment.    No reason for selecting this payment schedule is provided.    No quarterly or balloon payment amounts are specified or estimated in the Plan.    One might reasonably infer that the debtor hopes that the Jones Adversary Proceeding will have reached a sufficiently favorable and final resolution within the seven-year term.

The debtor proposes to secure his obligations under each Class Eight Note with the net proceeds, if any, of the Jones Adversary Proceeding.    The "net proceeds" would be calculated as the gross proceeds less (1) counsel's 33.3% contingent fee and expenses in the adversary proceeding; and (2) all allowed administrative expense claims in the bankruptcy case.[7]

Payments to all creditors under the Plan are to be funded from three sources: disposable income, net proceeds from the Jones Adversary Proceeding, and asset liquidation.    The debtor has not provided any projections to demonstrate how these sources will be sufficient to meet the obligations imposed by the Plan.    With his disclosure statement, the debtor provided only a schedule of current monthly expenses and a liquidation analysis.

---

[7]    The gross proceeds would be further reduced by $4,000, representing the debtor's estimate of the value of legal services provided by Jones in the underlying litigation between the debtor and Mr. Vegnani. The debtor's counsel has represented that the proposed setoff is likely to be removed from any modified plan.

The debtor proposes to use "disposable income earned by" him to make payments for the first five years of the Plan.[8]   He projects that his disposable income will total $6,248.33 per month, or $374,899.80 during that five-year period, but this projection implicitly relies on substantial contributions from his spouse, who is not mentioned in the Plan.[9]   The debtor has expressed that the monthly distributions to Navient would be funded entirely from the disposable income.   The debtor would use, for example, nearly 53% of the projected amount (i.e., $198,000 of the projected $374,899.80) to pay $3,300 per month toward Navient's claim in Class Six during the first five years of the Plan.   After the disposable income is used to pay Navient, any remaining amount would be available for other creditors.   In this regard, the Plan states that "[t]he Debtor shall make the [Class Eight Note] quarterly payments *in part* out of his PDI (projected to be $374,899.80) for the first five (5) years of the Plan" (emphasis added).

To pay Navient and Mr. Vegnani as proposed would take more than five years.   Yet, no regular source of income is proposed to be committed to the Plan beyond five years.   The Plan indicates, however, that any net proceeds from the Jones Adversary Proceeding—mentioned above as the security interest for the Class Eight Notes—would also generally be used to satisfy the debtor's obligations under the Plan.   Finally, the Plan indicates that, if disposable income

---

[8]   Neither Vegnani nor the United States trustee explicitly invokes section 1129(a)(15)(B), relating to the value of property distributed under a plan and its relationship to the debtor's projected disposable income.   The Plan uses a defined term "PDI" in some places, and the phrase "disposable income earned by the Debtor" in other places.   Moreover, the Plan is unclear as to whether creditors can expect a fixed amount that is calculated based on the debtor's projected disposable income, as defined in section 1325(b)(2), even if the actual disposable income realized in the future is, in fact, less.   Or perhaps the Plan contemplates that creditors will receive only the actual disposable income that is earned by the debtor during the five-year period specified in the Plan.

[9]   That estimate is based on an amended Schedule J appended to the disclosure statement, which schedule seemingly includes the debtor's spouse's income.   Schedule J has since been amended and, in its most recent form, shows monthly net income of $10,580 which would produce PDI of $634,800 over a five-year period, again including the spouse's anticipated income.

for five years and net proceeds from the Jones Adversary Proceeding are insufficient, the debtor would then liquidate or access equity from assets of his choosing and on his own terms.

By the debtor's estimate, if all the property of the bankruptcy estate were to be liquidated, unsecured creditors would not be paid in full.   Rather, after all priority claims were paid, the holders of general unsecured claims, such as Navient and Mr. Vegnani, would each be entitled to receive a share of the remaining liquidation proceeds in proportion to their claims.   The debtor could propose a confirmable plan of reorganization that would provide at least that same distribution value, assuming certain other minimum value requirements were met.   *See* 11 U.S.C. § 1129(a)(7)(A)(ii), (15).   Under either the hypothetical liquidation or equivalent value plan scenario, if the debtor were to receive a bankruptcy discharge, Navient would retain its right to pursue what remained of its nondischargeable debt, and Mr. Vegnani would be prohibited from pursuing the discharged balance of his claim.

Despite this, the debtor is voluntarily proposing to pay all claims in full.   Of course, the debtor is permitted to do this.   But a promise of full payment does not constitute a license to discriminate in an unfair manner.   In general, a debtor cannot favor one general unsecured claim over another without a legitimate justification.   As discussed below, through the separate classification and different treatment of Navient's and Mr. Vegnani's claims, the Plan discriminates against Class Eight by placing it at greater risk of not being paid.   In the circumstances of this case, that is unfair.

The debtor does not deny that Navient's claim is substantially similar to Mr. Vegnani's claim and thus eligible to be classified together.   *See* 11 U.S.C. § 1122(a).   The most obvious distinction between Navient's claim and the other general unsecured claims is that Navient's claim is nondischargeable.   That status, in and of itself, is insufficient to require separate

classification or to justify an exception to the requirement for equal treatment among general

unsecured claims.   *See* <u>In re Johnson</u>, 583 B.R. 682, 691-92 (B.A.P. 6th Cir. 2018) (discussing

nondischargeability in context of classification and treatment); *cf.* <u>Bentley v. Boyajian (In re</u>

<u>Bentley)</u>, 266 B.R. 229, 236, 240 (B.A.P. 1st Cir. 2001) (per curiam) (addressing separate

classification and preferential treatment of student loan debt in comparable chapter 13 context);

<u>In re Colfer</u>, 159 B.R. 602, 609-11 (Bankr. D. Me. 1993) (same).

    As noted, Class Eight is impaired and voted to reject the Plan.    Thus, the debtor must

establish that the proposed different treatment of Class Six does not discriminate unfairly against

Class Eight.   *See* 11 U.S.C. §§ 1129(a)(8), 1129(b)(1).    How one might "discriminate unfairly"

is not explained in the Bankruptcy Code.    "Discriminate" has typically been interpreted to refer

merely to different treatment.   *E.g.*, <u>In re Bentley</u>, 266 B.R. at 237 (interpreting related concept

under chapter 13 and "understand[ing] 'discriminate' to have no pejorative connotation here").

Proposing different treatment for similarly situated classes may not be inherently problematic.

It will, however, prevent plan confirmation if the different treatment is "unfair" to an impaired

class of claims that has rejected the plan.   *See* 11 U.S.C. § 1129(b)(1).

    Courts have developed an array of tests to evaluate whether such different treatment is

unfair, examining a wide range of factors.   *E.g.*, <u>In re Tribune Co.</u>, 972 F.3d 228, 240-41 (3d

Cir. 2020) (collecting cases and secondary sources); <u>In re Crawford</u>, 324 F.3d 539, 542 (7th Cir.

2003) (critiquing various tests applied in related chapter 13 context, noting inability "to think of

a good test ourselves," recommending that trial judges "seek a result that is reasonable in light of

the purposes of the relevant law," and recognizing similar approach adopted in <u>In re Bentley</u>); <u>In</u>

<u>re Bentley</u>, 266 B.R. at 237-39 (describing inadequacies of tests that, in chapter 13 context,

attempt to resolve abstractness of "fair" by assessing other equally abstract concepts such as

11

"reasonableness"); In re City of Detroit, 524 B.R. 147, 255-56 (Bankr. E.D. Mich. 2014)

(comparing tests, rejecting them, and concluding instead "that determining fairness is a matter of

relying upon the judgment of conscience" as informed by "the Court's experience and sense of

morality," as well as case circumstances and Code purposes).    Some courts have considered, for

example, the logic behind the plan proponent's justification for the different treatment and

whether such treatment would be necessary for the plan's success.    *See* In re Dow Corning

Corp., 244 B.R. 696, 700-01 (Bankr. E.D. Mich. 1999) (describing four-factor test adapted from

chapter 13 to chapter 11 context in In re Aztec Co., 107 B.R. 585, 588-91 (Bankr. M.D. Tenn.

1989) and collecting cases applying Aztec test and variations that eliminated overlapping

considerations).    Other courts have considered factors that reflect fairness embodied in Code

requirements.    *Cf., e.g.*, In re Bentley, 266 B.R. at 239-40 ("look[ing] to the principles and

structure of Chapter 13 itself" to establish "baseline" for evaluating fairness of disparate benefits

and burdens being allocated to similarly situated classes).    Along those lines, one common

focus is equality of distribution among similarly situated creditors.    But this inquiry into

equality is not, as the debtor seems to believe, strictly limited to the amount to be distributed to

each creditor.    Not all 100% dividends are created equally.    A distribution of marketable

securities is different from a distribution of a fractional interest in undeveloped real estate.    A

distribution on the first day following confirmation is different from a distribution seven years

later (even if the deferred stream of payments is brought to present value with a rate of interest).

The point here is that risk matters when thinking about fairness and the balancing of debtor and

creditor interests that must occur in any chapter 11 case.    *E.g.*, In re Tribune Co., 927 F.3d at

241, 242-44 (describing and heavily incorporating principles and points articulated in, and in

cases and other writings drawing upon, Bruce A. Markell, A New Perspective on Unfair

Discrimination in Chapter 11, 72 Am. Bankr. L.J. 227 (1998)).    Regardless of the test used to
ferret out unfair discrimination, the Plan does not pass muster.

As noted, the Plan itself contains no justification for the separate classification and
different treatment.    This is not a circumstance, for example, where the disparate treatment of
one creditor (here, Navient) is necessary to allow the debtor to pay a dividend to another creditor
(here, Mr. Vegnani).    There is no rational explanation of why the debtor needs seven years to
pay Mr. Vegnani in full.    It appears that the debtor wants to retain the equity in his residence
(and use that equity to pay some creditors, but not others) and, at the same time, force Mr.
Vegnani to wait seven years for full payment.    To make matters worse, the payments made
during the seven-year term are based on a 30-year amortization schedule.    While the equity in
the residence is dangled as a backstop to ensure full payment to Mr. Vegnani, there is nothing in
the Plan preventing the debtor or his spouse from dissipating that equity during the seven-year
term and leaving Mr. Vegnani without the promised payment.

From his response to the United States trustee's objection, the debtor's justification
appears to be that the separate classification would allow him to pay Navient's claim in full over
fifteen years, as anticipated before he sought bankruptcy relief, rather than in seven years under
Class Eight.    The 15-year payment term certainly could be advantageous to the debtor.    The
debtor makes a follow-on assertion—that this treatment of Navient's claim advantages Mr.
Vegnani by freeing up more disposable income—which is, however, unsupported.

It is not invariably true that paying Navient's claim as agreed would require less of the
debtor's disposable income than if the claim were to be, for example, placed in and treated under
Class Eight.    Quarterly payments under Class Eight would be based upon a 30-year
amortization schedule—i.e., a longer period than the roughly fifteen years remaining under the

13

existing payment schedule on Navient's claim.    Depending upon the interest rate applied, if

Navient's claim were to be paid based upon a 30-year amortization schedule under Class Eight,

the payment could require less of the debtor's disposable income than would be required for

Navient's claim under Class Six as currently formulated.[10]    Such a possibility undermines the

debtor's barebones proposition that separately classifying Navient's claim under Class Six

categorically provides the advantage of freeing up disposable income to pay Mr. Vegnani's claim

under Class Eight.

The debtor's argument also overlooks other key aspects of the different treatment.    Two

such aspects are discussed below: payment structures and creditors' options for recourse in the

event of the debtor's default under the Plan.    Mr. Vegnani has repeatedly expressed concerns

about both.

Although not overtly stated in the Plan, the debtor has represented that Class Six

payments would be made entirely from his disposable income.    That is, $3,300 per month of the

debtor's disposable income would be earmarked for paying Navient's claim in Class Six.    By

comparison, whatever amount the Class Eight quarterly payments might ultimately be—largely

depending upon the interest rate to be applied—the debtor is proposing to pay those payments

only "in part" from his disposable income.    Thus, after paying Navient's claim in Class Six,

only what remains of the debtor's disposable income could be devoted to paying the quarterly

payments on Mr. Vegnani's claim in Class Eight.    Because Class Six would be paid fully from

---

[10]    Under Class Six, $3,300 per month would be paid toward Navient's claim from the debtor's
disposable income.    That equals $9,900 per quarter.    If the Class Eight interest rate were to be fixed at,
for example, 5.25%, and Navient's claim were to be treated under Class Eight, the quarterly payment
would be about $9,897, which is less than the $9,900 needed per quarter under Class Six.    This is not to
say that 5.25% would be the correct interest rate on the Class Eight Notes.    The observation is made
solely to respond to the debtor's assertion that Mr. Vegnani is better off with Navient's claim being
classified in Class Six (instead of Class Eight).

disposable income before Class Eight is paid, Class Eight is less likely than Class Six to be paid

from disposable income if there is a shortage in that income.[11]    No other funding source is

specifically designated to cover any remaining part of quarterly payments to Class Eight after

disposable income has been exhausted.    Rather, the Plan generally anticipates that disposable

income insufficiencies—which could affect payments under Class Six, Class Eight, and possibly

others—would be addressed through any net proceeds from the Jones Adversary Proceeding and,

if needed, by unspecified asset liquidation.[12]

    As the Plan is drafted, the availability or commitment of these other sources of funding is

more speculative than the five-year commitment of disposable income.    The availability of any

net proceeds from the Jones Adversary Proceeding, which is currently in the discovery phase,

will depend on factors such as the debtor's ability to obtain, and maintain through any appeal, a

sufficiently favorable result, as well as depending upon the terms under which the debtor might

opt to settle that matter instead.    There is no certainty about whether and, if so, when the net

---

[11]    Although the denial of confirmation is not based on feasibility, a comment about the debtor's
projected income is warranted.    Over the past year, the debtor has filed multiple monthly operating
reports that show less income than projected.    Several reports reflect no income from salary, wages, or
self-employment, and some reports, including one for February 2022, reflect no income at all.    These
shortages have not been balanced by higher income in other months and have not been adequately
explained.    Also, as noted, the debtor's disposable income projection relies heavily upon his spouse's
willingness and ability to contribute $12,900 per month in take-home pay from real estate sales—
described further as an amount that "fluctuates due to the nature of the real estate industry."    [Dkt. No.
24 at 20].    The debtor has not yet provided any details about this fluctuation or about how that take-
home pay amount compares with his spouse's actual earnings over the past year.

[12]    Because the debtor is proposing to commit disposable income for only five years, the extent to
which he would rely upon the other proposed sources after five years is unclear.    That is, the Plan does
not designate a funding source for years 6 and 7 of the quarterly payments under Class Eight or for the
estimated years 6 through 15 of monthly payments to Class Six.    Based on the debtor's representations,
although not committing to do so in the Plan, he would continue to devote disposable income to paying
Navient beyond five years.    Because that debt is nondischargeable, the debtor has a powerful incentive
to pay Navient's claim, in any event, before paying any other claims.

proceeds may become available.    The utility of the debtor's proposal to use such net proceeds

as security for Class Eight payments is tainted by the same unknowns.

The debtor's proposal to liquidate or access equity in assets of his choosing, on his own

terms, as a last resort offers similarly indefinite assurance.    As drafted, the Plan would not

definitively obligate the debtor to liquidate or access equity in any asset.    Further, although the

Plan would permit or require the debtor to "retain all of his property and assets, not transferred

pursuant to th[e] Plan," nothing would appear to require the debtor to preserve or allocate the

liquidation value (or his equity) for any specific Plan obligation.    The Plan provides that

property of the bankruptcy estate would vest in the debtor as of the Plan's effective date, which

would be at least 60 days after the entry of the confirmation order.    It also provides that,

immediately after confirmation, "subject to compliance with the terms of th[e] Plan, the debtor

may, without further approval of the Bankruptcy Court, use, sell, assign, transfer, abandon,

settle, or otherwise dispose of at a public or private sale any of the Debtor's Assets for the

purpose of liquidating and converting such assets to cash, making distributions, and fully

consummating the Plan."    Plan § 8.6; *see also* Plan § 1.4 (defining "Assets" to include property

of the bankruptcy estate and of the debtor "whether such property is now existing or hereafter

arising or acquired").    Other than the general statement that the debtor "shall retain all of his

property and assets, not transferred pursuant to this Plan," the Plan lacks instruction about

whether the debtor would be restricted from or would need Court permission to access equity in

his Assets for purposes other than meeting his obligations under the Plan.    In any event, the

Plan does not propose any type of lien on the residence to ensure that the existing equity value

could not be dissipated to the detriment of the holders of the Class Eight Notes.

The debtor has recently expressed an intent to use some of the equity in his principal residence by the end of this year to satisfy the Class Four claim held by Medlogix, discussed below.   This use of equity is not specifically proposed in the Plan.   Yet, such a use could impact whether the debtor would have sufficient home equity available to access if needed, for example, to pay the proposed quarterly payments or the balloon payment toward Mr. Vegnani's claim.   Further, any new monthly payment due on a home equity loan could reduce the debtor's disposable income, thereby exacerbating the payment risk to Class Eight.   Overall, given the debtor's commitment to pay Class Six fully but Class Eight only partially from disposable income, and given the significant uncertainties surrounding the debtor's other potential sources of funding, Class Eight is saddled with a much greater risk of nonpayment (or partial payment) relative to Class Six.

This greater risk would be compounded by the further burden that Class Eight would lack adequate recourse in the event of the debtor's default under the Plan.   In addition to the unknown risk of the adversary proceeding yielding little or even nothing, the debtor's reservation of the right to settle it as he alone sees fit could severely limit the efficacy of that asset as collateral for the Class Eight Notes.   Outside the bankruptcy context, it is somewhat difficult to envision a consensual lender with a lien on a commercial tort claim as that lender's sole piece of collateral having agreed that the debtor can settle the tort claim on any terms that the debtor selects.   The reason for that is obvious.

Further, the debtor has not committed to liquidating any specific asset and has not supplied the terms under which he would be willing to do so.   Thus, although the Plan would permit him to liquidate assets for the purpose of making Plan payments, a substantial question

exists as to whether he could be compelled to do so.[13]    A substantial question also exists as to whether any ability to compel him would remain a worthwhile option.    The debtor's unrestricted ability to liquidate or access equity in his assets for Plan payments could result in the debtor draining such resources in favor of paying other classes, including the nondischargeable student loan debt in Class Six, before Class Eight has an opportunity or need to attempt to enforce its rights under the Plan.

The lack of limitations is particularly concerning in connection with the proposed Class Eight balloon payment.    Assuming that the debtor could and did pay the Class Eight quarterly payments for seven years, the balloon payment amount would still be substantial—at a minimum, hundreds of thousands of dollars—because of the 30-year amortization schedule.[14] As discussed above, the back-end sources of funding would be speculative, and Class Eight would be disproportionately affected by their inadequacies.    If the debtor were to fail to make the balloon payment, Class Eight's enforcement options could be quite limited to nonexistent, creating a significant potential that the Class Eight debt goes unpaid.

Because the debtor would have promised to pay Class Eight in full under the Plan and thus not sought to discharge any of the Class Eight debt, the promise to pay would remain enforceable.    *See* 11 U.S.C. § 1141(d)(5).    If the debtor defaulted on the balloon payment, the

---

[13]    As Mr. Vegnani notes, to the extent that the debtor's spouse's cooperation would be required for a liquidation of or a refinancing to access equity in a jointly-owned asset such as the principal residence, that cooperation is not mandated by the Plan.    The debtor's spouse is not mentioned in the Plan and has not separately made any commitment, let alone a binding one, to cooperate in the execution of the Plan.

[14]    Without knowing the interest rate to be applied, estimates are difficult.    Ignoring interest and using round numbers for the sake of an example: if the debtor were to issue Mr. Vegnani an $810,000 note with a 30-year amortization schedule, the debtor would be required to pay $189,000 in seven years ($6,750 per quarter).    That would initially leave $621,000 remaining for the balloon payment.    Mr. Vegnani has received funds from another source that would be credited toward the balloon payment. Applying that credit in this example would leave close to $300,000 owed for the balloon payment.

note issued under Class Eight could, in theory, be enforced against the debtor and his assets in accordance with applicable nonbankruptcy law.    The value of such an enforcement mechanism would be dubious, however, because the Plan contains no adequate provision to ensure that the debtor's assets—namely, his interest in the principal residence—would remain sufficiently unencumbered and valuable to be worth pursuing at that point.    Moreover, the debtor's voluntary promise to pay the claims in Class Eight in full would not render those claims nondischargeable: the debtor might seek to discharge what remains of the Class Eight debt in the future by seeking further relief in bankruptcy court.

Class Six faces much less serious risk.    Regardless of how its claim is classified, because the debt is nondischargeable, Navient will retain an ability to enforce the debt until it is fully paid.    With monthly payments under Class Six (per the parties' existing agreement), Navient could monitor payment progress more closely than Class Eight and more promptly act in response to default.    Because Class Six payments would be equally divided—i.e., no balloon payment—Navient is not facing risks like Class Eight is upon reaching the 7-year mark.    By then, nearly half of the Navient debt should have been paid, and Navient would continue to have the debt's nondischargeable status helping to assure ongoing payments.    The disparity between Classes Six and Eight need not be perfectly balanced for this debtor to confirm a plan, but it would be patently unfair to allow the debtor to amplify the imbalance, to this extent, by preferring Class Six in its payment structure while simultaneously including provisions that undermine Mr. Vegnani's remedies following a default.    The unfair discrimination against Class Eight ensures that the Plan cannot be confirmed.    *See* 11 U.S.C. § 1129(b)(1).

### b. <u>Not Fair and Equitable as to Class Eight</u>

Based upon a 2018 "Secured Promissory Note" that matured at the end of 2021, Medlogix's claim is for nearly $88,000 and is designated as being fully secured by unspecified assets of the debtor (but apparently not his principal residence or any motor vehicle). The debtor's bankruptcy schedules list the debt as unsecured. Because the debtor has found no indication that Medlogix recorded or filed any public notice of the lien, the debtor believes that Medlogix's lien is unperfected. Medlogix did not attach any evidence of lien perfection to its proof of claim, and it has not yet appeared through counsel in this case to dispute the debtor's contention that the lien is unperfected.

The debtor maintains that the unperfected status of the lien does not affect its enforceability and that, based on having secured status, Medlogix's claim is entitled to a higher priority than general unsecured claims. The debtor has placed Medlogix's "unperfected Secured Claim" alone in Class Four, which is identified as impaired. The debtor proposes to pay Class Four in full, including contractual nondefault interest, by this year's end. The debtor proposes to keep Medlogix's lien in place in the meantime. As noted, although not specified in the Plan, the debtor has expressed an intention to use home equity to satisfy the proposed Class Four obligation.

If Medlogix's lien is unperfected, the debtor, as the debtor-in-possession, could exercise a trustee's powers under section 544(a)(3) to avoid the lien. With the lien avoided, Medlogix's claim would become a general unsecured one, like Mr. Vegnani's. The debtor's counsel has repeatedly conceded that avoiding the lien would be a straightforward exercise. The debtor insists, however, that because he is proposing to pay all creditors in full, seeking to avoid the lien

would only waste resources—providing no benefit to anyone.   In this argument, the debtor again overlooks key disparities in claim treatment that warrant consideration.

As noted, because Class Eight is impaired and has rejected the Plan, the debtor must show that "the [P]lan does not discriminate unfairly, and is fair and equitable," as to Class Eight. *See* 11 U.S.C. § 1129(b)(1).   Comparing the treatment of Classes Four and Eight, the combined circumstances show conspicuous advantages to Class Four.   By declining to pursue the admittedly easy process of avoiding Medlogix's seemingly unperfected lien, the debtor is permitting Medlogix's claim to retain a rank above the general unsecured claims.   In doing so, the debtor retains a basis for separate classification and preferential treatment of Medlogix's claim.[15]   Between Classes Four and Eight, the proposed treatment differences are stark.   Using existing home equity, Class Four would be paid in full, plus interest at a known rate, within less than a year.   Conversely, using a to-be-determined combination of suppositious funds, Class Eight would be paid in full, plus interest at an unknown rate, over a roughly seven-year period— with the majority of the funds not due until the balloon payment at the end.

If the debtor avoided Medlogix's lien, leaving Medlogix holding a general unsecured claim, the debtor would generally be prohibited from treating the Medlogix claim better than other general unsecured claims.   Thus, contrary to the debtor's assertion, avoiding the lien would seemingly benefit Mr. Vegnani and other general unsecured claimholders.   If the debtor avoided Medlogix's lien but then nevertheless proposed the current Class Four treatment for that

---

[15]   Contrary to Mr. Vegnani's contention, an unperfected lien does not automatically render a claim unsecured.   Also contrary to Mr. Vegnani's assertion, the separate classification of Medlogix's secured claim is not gerrymandering of the Plan's classes—an impermissible tactic of separately classifying substantially similar claims for the purpose of gaining a needed favorable vote from an impaired class. 11 U.S.C. § 1129(a)(10); In re Barakat, 99 F.3d at 1525.   At this moment, the claim is not substantially similar to others, including Mr. Vegnani's general unsecured claim, and thus, as it is, would be ineligible to be classified with other claims.   *See* 11 U.S.C. § 1122(a).

claim, the unfair discrimination against the general unsecured claims in Class Eight would be

undeniable.    Relative to Class Four, Class Eight would be waiting about seven years longer for

a less guaranteed full payment, with no apparent justification for the inequality.    A chapter 11

debtor in possession cloaked with the powers of a trustee has some discretion in deciding

whether to pursue an avoidance action.    In the circumstances of this case, however, the debtor's

refusal to take steps to avoid an unperfected lien, combined with the favorable proposed

treatment for Class Four, render the Plan unfair and inequitable to Class Eight.    *See* 11 U.S.C.

§§ 102(3); 1129(b)(1)-(2).

## II.    Conclusion

For these reasons, confirmation of the Plan will be denied, and a separate order will be

issued.    That order will grant the debtor 21 days in which to file a modified plan and disclosure

statement.    Failure to do so in a timely manner will constitute cause for dismissal or conversion,

and the case may, without further notice or opportunity for hearing, be dismissed or converted.

Dated: April 8, 2022

_____
Michael A. Fagone
United States Bankruptcy Judge
District of Maine